Rockingham
No. 90-253

THE STATE OF NEW HAMPSHIRE

v.

GORDON REID

March 20, 1992

*John P. Arnold,* attorney general (*Mark S. Zuckerman,* assistant attorney general, on the brief and orally), for the State.

*James E. Duggan,* chief appellate defender, of Concord, by brief and orally, for the defendant.

HORTON, J. The defendant, Gordon Reid, was tried and convicted in Rockingham County Superior Court (*Dunn,* J.) on charges of burglary, theft, and two counts of criminal mischief. Prior to trial, he moved to suppress all evidence obtained incident to his arrest on the grounds that he was arrested without probable cause in violation of both part I, article 19 of the State Constitution, and the fourth and fourteenth amendments of the Federal Constitution. He also filed a motion *in limine* to exclude from evidence a pair of sneakers, seized from him subsequent to arrest, on the grounds that they were not properly authenticated pursuant to New Hampshire Rule of Evidence 901. On appeal, he argues that the trial court erroneously denied both motions. We disagree and affirm.

The facts are straightforward. On June 7, 1989, at 2:52 a.m., Officer Janet Champlin of the Portsmouth police discovered that a showroom window at the Goss Lincoln-Mercury car dealership had been smashed. The officer found that two doors had been forcibly opened and that a 1988 Lincoln Continental had been stolen. Another car parked near the showroom had been damaged. Further investigation revealed that a door to the parts department was damaged, and that a sneaker tread pattern impression appeared both on the door and on a piece of plexiglass that had been broken out of it. The stolen automobile was ultimately recovered in Mamaroneck, New York.

Four days later, on June 11, 1989, at approximately 8:30 p.m., Portsmouth Police Officer Timothy Brownell responded to an alarm at Coast Pontiac. Upon arriving at the scene, he observed the defendant walking around inside the dealership. The officer motioned and yelled at the defendant to come to the door, but was ignored. Officer Brownell drew his gun and followed the defendant along the front of the glassed-in lobby, but the defendant disappeared behind a partition, broke through a window, and escaped. During this time, the officer was approximately ten feet from the defendant. Officer Brownell put out a radio broadcast describing a "black male, dark clothes, dark jacket, dark pants, balding on top."

About five minutes after receiving the broadcast, Officer Thomas Winter stopped the defendant approximately one-half mile from the car dealership. At the officer's request, the defendant identified himself. The officer smelled alcohol on the defendant's breath, and noticed that he was sweating and out of breath. The defendant appeared to be agitated or nervous. Officer Winter asked the defend-

ant, who agreed, to wait in the back of the police cruiser until he could be identified. Shortly thereafter, another officer arrived on the scene. The defendant became more agitated and started yelling. He was removed from the police cruiser, frisked, handcuffed, and placed back in the cruiser. Officer Brownell then arrived and identified the defendant as the individual he had seen inside the Coast Pontiac dealership.

The defendant was transported to the Portsmouth police station. Officer Winter observed, at the time of arrest, that the defendant was wearing white leather sneakers, and that there were small particles of glass embedded in the soles of the sneakers. After the defendant was booked at the police station, Officer Winter was directed to secure the sneakers for evidence by placing them in a brown paper bag. He obtained a pair of white leather sneakers from the booking area. He did not observe either the defendant or anyone else remove the sneakers from the defendant's feet during the booking procedure. No other males were arrested or booked that evening.

At trial, a State's expert testified that footwear comparisons have the same scientific validity as fingerprints. He described a match between the sneaker tread and the impressions left on the plexiglass, and stated that he was one hundred percent certain that the sneakers had caused the impression. The defendant was identified at trial by a witness who had observed him driving the vehicle in New York. Based upon this evidence, the defendant was convicted of burglary of Goss Lincoln-Mercury Continental, theft of the Lincoln Continental, and causing damage to the showroom and the other automobile during the burglary.

■ We first address the defendant's claim that he was arrested absent probable cause. The defendant relies upon both part I, article 19 of the New Hampshire Constitution and the fourth and fourteenth amendments to the United States Constitution. In accordance with our holding in *State v. Ball*, 124 N.H. 226, 471 A.2d 347 (1983), we first consider the defendant's claims under our State Constitution, and look to federal case law only to aid in our analysis, *State v. Gravel*, 135 N.H. 172, 176, 601 A.2d 678, 680 (1991); *Michigan v. Long*, 463 U.S. 1032, 1040–41 (1983). Because the Federal Constitution does not provide greater protection than does the New Hampshire Constitution in this area, *see State v. Chaloux*, 130 N.H. 809, 812, 546 A.2d 1081, 1083 (1988), we need not analyze the federal claim separately. We also note that the trial court's decision will not be reversed unless the decision "when viewed in the light most favor-

able to the State . . . is contrary to the manifest weight of the evidence." *Gravel*, 135 N.H. at 176, 601 A.2d at 680.

The defendant concedes that the police had sufficient justification to seize him for a brief investigative stop. *See State v. Maya*, 126 N.H. 590, 595, 493 A.2d 1139, 1143 (1985). He also does not dispute the fact that they had probable cause to arrest him for burglary *after* Officer Brownell arrived and identified him as the individual seen inside the dealership. Rather, the defendant argues that he was under arrest after he was removed from the police cruiser, handcuffed, placed back in the cruiser, and detained for fifteen to twenty minutes prior to being identified, and that these actions constituted an arrest without probable cause. The State contends that the decision to handcuff the defendant and place him back in the cruiser was reasonable under the circumstances, and did not rise to the level of an arrest.

 As the defendant correctly recognizes, "the police may temporarily detain a suspect for investigatory purposes, on grounds that do not amount to probable cause to arrest him for the commission of a crime." *Id.*; *see also State v. Brodeur*, 126 N.H. 411, 415, 493 A.2d 1134, 1137–38 (1985); *Terry v. Ohio*, 392 U.S. 1 (1968). For such a detention to be lawful under the State Constitution, the police must have articulable suspicion that the individual detained "has committed or is about to commit a crime." *Brodeur*, 126 N.H. at 415, 493 A.2d at 1137–38. Further, "[t]he scope of the detention must be carefully tailored to its underlying justification . . . [and the detention] must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983), *quoted in Maya*, 126 N.H. at 595, 493 A.2d at 1143.

 A person is considered seized for purposes of part I, article 19 "'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *State v. Riley*, 126 N.H. 257, 262, 490 A.2d 1362, 1366 (1985) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.)); *see Chaloux*, 130 N.H. at 813, 546 A.2d at 1084 (stating that *Riley* adopted *Mendenhall* test to determine when a seizure has occurred under part I, article 19 of State Constitution). Not every seizure, however, rises to the level of an arrest. *Chaloux*, 130 N.H. at 813–14, 546 A.2d at 1084. "[A] reasonable perception of loss of freedom to leave signals that a seizure has occurred, but not necessarily that the seizure is an arrest . . . ." *Id.* at 814, 546 A.2d at 1084. The genus of seizure encompasses not only arrests, but also

"those more limited and less intrusive investigative stops on suspicion of crime which are justified by articulable facts that do not amount to probable cause for arrest." *Id.* at 813–14, 546 A.2d at 1084.

In this case, we find that the defendant was seized when he was handcuffed and then placed back in the police cruiser for the second time, as he could reasonably have perceived that he was not free to leave at that time. In fact, the defendant could not have reasonably believed otherwise. We do not find, however, that the defendant was under arrest at that moment.

The determination of when an arrest occurs depends upon the facts and circumstances of a particular case. *State v. Polito*, 132 N.H. 410, 412, 566 A.2d 183, 184–85 (1989). Officer Winter was armed with a description of the Coast Pontiac perpetrator when he encountered the defendant. The officer explained that because he was alone, because he smelled alcohol on the defendant's breath, and because the defendant appeared agitated, he asked the defendant to wait in the cruiser until he could be identified. The defendant acquiesced. A second officer arrived at the scene at which time the defendant started yelling from the back seat and generally acting in an agitated manner. The two officers removed the defendant from the police cruiser, patted him down, handcuffed him, and returned him to the cruiser. Moments later, Officer Brownell arrived and positively identified the defendant. The officers felt it necessary to handcuff the defendant for their own safety. *See United States v. Levesque*, 625 F. Supp. 428, 444 (D.N.H. 1985) (permissible for officers to utilize reasonable means, such as handcuffs, to secure occupants while investigation conducted where occupant was possible fugitive), *aff'd*, 879 F.2d 853 (1st Cir. 1989); *see also People v. Allen*, 73 N.Y.2d 378, 379–80, 538 N.E.2d 323, 324 (1989) (use of handcuffs not dispositive of whether a detention becomes a full-blown arrest because police officers must be permitted to take reasonable steps to assure their safety in a rapidly developing and dangerous situation). That the defendant was confined in the police cruiser "only confirms that he was detained." *Chaloux*, 130 N.H. at 814, 546 A.2d at 1085. Further, although not determinative of this issue, *see Riley*, 126 N.H. at 263, 490 A.2d at 1366, Officer Winter testified that he did not consider the defendant under arrest at this time.

We also note that the scope of the stop was reasonable in its length. *See Maya*, 126 N.H. at 595, 493 A.2d at 1144. In declining to adopt a bright line rule that a twenty-minute detention is too long to be justified under *Terry*, the United States Supreme Court has ex-

plained that several factors are relevant to the assessment of "whether a detention is too long in duration to be justified as an investigative stop." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). These factors include the law enforcement purposes that are served by the detention, the diligence with which the investigation is pursued by the police, and the scope, intrusiveness and duration of the detention. *See United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988) (citing *Sharpe*, 470 U.S. at 685–86), *cert. denied*, 489 U.S. 1019 (1989).

Here, Officer Winter came upon the defendant five minutes after receiving the radio dispatch. The second officer arrived shortly thereafter. Officer Brownell joined the first two officers at the cruiser only a few minutes later, basically the time in which it took him to travel to where the defendant was being held, and not more than fifteen or twenty minutes from when he had first observed the defendant inside the dealership. The defendant was detained for a period of not more than fifteen minutes, the maximum period from when he was initially approached by Officer Winter until he was positively identified by Officer Brownell.

The defendant suggests that the mere act of placing him in the police car was tantamount to an arrest, and relies on *Riley* for this proposition; in fact, the defendant argues that because he was handcuffed, he was even more restrained than the defendant in *Riley*.

The issue presented in each case, however, differs significantly: the present case involves an investigatory stop and seizure and examines whether that seizure escalated to the level of an arrest; in *Riley*, on the other hand, we found that probable cause, in fact, existed at the time the defendant was seized, and therefore, had no occasion to address the question of when an arrest occurred. The defendant's reliance on *Riley* is thus misplaced.

Here, the defendant was placed in the police cruiser for investigatory purposes. Admittedly, the defendant was seized, but his detention remained an investigative stop, not an arrest. The officers were not certain that the defendant was involved in the crime, and would have released him if Officer Brownell had not been able to identify him as the individual he had seen inside the dealership. The use of handcuffs was permissible for the safety of the officers, and the detention was reasonable in length. Because we find that the seizure had not escalated into an arrest prior to the time that Officer Brownell identified the defendant, we need not address the defendant's further argument that he was arrested without probable cause.

The defendant next argues that the trial court wrongly decided his pre-trial motion *in limine* to exclude from evidence a pair of white leather sneakers that he asserts were not properly authenticated as required by New Hampshire Rule of Evidence 901. The State contends that sufficient circumstantial evidence existed to authenticate them and to satisfy Rule 901.

Rule 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The question here is whether sufficient evidence existed to demonstrate that the sneakers were, in fact, worn by the defendant when he was booked. For purposes of deciding this issue, we note that the federal rule of evidence is identical to our State rule. *Compare* N.H. R. EV. 901 *with* FED. R. EVID. 901.

 The proof necessary to connect an evidentiary exhibit to a defendant "may be made by circumstantial evidence." *United States v. Mendel*, 746 F.2d 155, 167 (2d Cir. 1984), *cert. denied*, 469 U.S. 1213 (1985). The State need only demonstrate "a rational basis from which to conclude that the exhibit did, in fact, belong to" the defendant. *Id.; see also United States v. Masse*, 816 F.2d 805, 813 (1st Cir. 1987). The contested evidence, if otherwise relevant, should be admitted "once a prima facie case has been made on the issue [of authentication]." J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 901(a) [01], at 901–18 (1991). Once the evidence is admitted, "the rest is up to the jury." *Id.* at 901–19; *see State v. Thresher*, 122 N.H. 63, 71, 442 A.2d 578, 582 (1982) (decision to admit testimony within trial court's discretion and jury can determine whether, and to what extent, to believe it).

The problem in this case is that none of the police officers testified as to who removed the sneakers from the defendant's feet. This omission, however, is not fatal, because the evidence provides a link sufficient to support the authentication of the sneakers.

The defendant was arrested by Officer Winter, who took the defendant to the booking area. The officer testified that the defendant was wearing white leather sneakers on the night of the arrest and that glass was embedded in their soles. Although there was no testimony as to who removed the sneakers from the defendant's feet, testimony was received describing the standard booking procedure utilized by the Portsmouth police.

Officer Winter explained that after a prisoner is booked, "his property is seized and placed in a property drawer or left in the booking

area near their property drawer." Officer William Irving testified that because prisoners are not permitted to wear footwear in the cells, their shoes are taken from them either before they are placed in the cells or during booking. He stated that it is standard procedure, for inventorying the property of arrestees, to take the footwear of all prisoners who are booked.

Officer Winter, while still on the same shift, was instructed to secure the defendant's sneakers from the booking area. He obtained the white leather sneakers that were admitted at trial from the booking area. The officer testified that there were no other sneakers in the booking area at that time. He also testified that no other males were processed through booking during his shift. Further, Officer Winter related that the sneakers he retrieved had small particles of glass embedded in their soles. This is consistent with his observation of glass particles in the soles of the defendant's sneakers at the time of arrest.

 Although no direct evidence of who removed the defendant's sneakers was presented, an adequate foundation existed to admit the sneakers into evidence. The trial court could fairly conclude that the "matter in question [was] what its proponent claim[ed] it to be." N.H. R. Ev. 901(a); *see Masse*, 816 F.2d at 813.

*Affirmed.*

All concurred.